UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| John Doe, | ) Civil Action No.: 4:18-cv-00268-RBH |
| Plaintiff, | ) |
| v. | ) **ORDER** |
| Coastal Carolina University, | ) |
| Defendant. | ) |

This is a Title IX and gender discrimination action arising out of Plaintiff John Doe's permanent dismissal from Coastal Carolina University. This matter is before the Court on Defendant Coastal Carolina University's motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* ECF No. 6. For the reasons set forth below, the Court grants in part and denies in part Defendant's motion, granting it as to the state law claims on the basis of Eleventh Amendment immunity but denying it as to the Title IX and gender discrimination claims.[1]

**Factual Allegations**

The complaint and attachments thereto allege and describe the following. John Doe ("Plaintiff") and Jane Doe ("Jane Doe") were students at Coastal Carolina University ("CCU" or "Defendant") during the 2016–2017 school year. Compl. at ¶¶ 1, 3, 43 [ECF No. 1]. Plaintiff was a male, freshman student in good standing and a member of the CCU football team. *Id.* at ¶ 8. Jane Doe was a female student, a member of the CCU cheerleading team, and an acquaintance of Plaintiff. *Id.* at ¶¶ 9–10. On August 27, 2016, after attending an off-campus pool party and consuming alcohol, Plaintiff and Jane Doe had consensual sex in Jane Doe's apartment. *Id.* at ¶¶ 47–56. Later that evening,

---

[1] Pursuant to Local Civil Rule 7.08 (D.S.C.), the Court dispenses with a hearing on the motion.

several officers with the City of Conway Police Department ("Conway PD") were dispatched to Conway Medical Center to respond to a complaint by Jane Doe that she was sexually assaulted earlier that day. *Id.* at ¶ 57; *see* ECF No. 1-1 at 3. The responding officers determined that a sexual assault had occurred, and the police report names two suspects: Plaintiff and another male CCU student ("Roe") who had been in Jane Doe's apartment after Plaintiff's encounter with her. Compl. at ¶ 57; *see* ECF No. 1-1 at 3–6.

Subsequently, on October 14, 2016, after investigating Jane Doe's complaint, Conway PD officers presented their findings to a state prosecutor who reviewed the case and determined there was sufficient evidence to charge Roe with criminal sexual conduct in the third degree in violation of S.C. Code § 16-3-654 but insufficient evidence to proceed with a charge against Plaintiff. Compl. at ¶ 62; ECF No. 1-1 at 2; ECF No. 1-2 at 2. Upon learning of Jane Doe's sexual assault allegations against Plaintiff, Defendant notified him that he was being formally charged with violating Defendant's Code of Student Conduct (the "Student Code"), specifically, its Sexual Misconduct Policy. Compl. at ¶¶ 44, 64. Pursuant to the Student Code, Defendant assigned a Title IX investigator to examine the allegations, who, in Plaintiff's case, was Defendant's Dean of Students and Vice President of Student Rights and Responsibilities, Travis Overton ("Overton"). *Id.* at ¶¶ 15, 45. The Student Code requires an investigator to receive appropriate training and maintain complete impartiality during the course of an investigation. *Id.* at ¶ 45.

Defendant convened a panel of its Student Conduct Board to determine if Plaintiff violated the Student Code with his alleged sexual misconduct. *Id.* at ¶ 14. On or about November 29, 2016, Defendant notified Plaintiff and Jane Doe that a Student Conduct Board hearing was scheduled for December 6, 2016, where Plaintiff would have the opportunity to respond to his alleged violation of the

Student Code. *Id.* at ¶ 16; ECF No. 1-3. On December 6, after reviewing documents and hearing testimony from witnesses, including Plaintiff and Jane Doe, the panel found in Plaintiff's favor, determining the evidence was insufficient to support a finding that he violated the Student Code. Compl. at ¶ 20.

On December 15, 2016, Jane Doe appealed the panel's decision. *Id.* at ¶ 23. However, Jane Doe's appeal did not conform to the procedures set forth in Defendant's Student Conduct Handbook, which require an appeal to be submitted in writing within three days of the panel's decision and to enumerate the panel's errors. *Id.* at ¶¶ 22, 25. Jane Doe's appeal was not in writing, untimely, and failed to list specific errors. *Id.* at ¶¶ 22–23, 26. Nevertheless, Defendant's Provost and Executive Vice President Ralph Byington ("Byington") reviewed the appeal and requested a new hearing, the basis of which was to determine whether Defendant followed its disciplinary procedures providing notice of the charges and an opportunity to respond and whether "new information exist[ed] sufficient enough to alter the original decision and why such information was not available at the original hearing." *Id.* at ¶ 27 (citing Jan. 5, 2017 Letter [ECF No. 1-7]).

On March 31, 2017, an appeal panel convened for a second hearing. *Id.* at ¶ 32. Without hearing any witness testimony, the appeal panel "found a preponderance of evidence to indicate that [Jane Doe] was incapacitated by alcohol consumption, based on the statements provided. [Plaintiff] was familiar with [Jane Doe] from previous interactions and therefore reasonably should have known that [she] was incapacitated and therefore unable to give consent." *Id.* at ¶ 32 (citing Apr. 3, 2017 Letter [ECF No. 1-8]). As a result, Plaintiff was permanently dismissed from CCU effective March 31, 2017. [Apr. 3, 2017 Letter].

**Procedural History**

On January 31, 2018, Plaintiff filed suit in federal court against Defendant, styling his causes of action as: (1) violation of Title IX of the Education Amendments of 1972; (2) violations of Title IX Office for Civil Rights ("OCR") Rules; (3) breach of contract; (4) breach of the covenant of good faith and fair dealing; (5) promissory estoppel; (6) negligence; and (7) a declaratory judgment. Compl. at ¶¶ 77–146. As relief, Plaintiff seeks unspecified money damages and equitable relief, requesting the Court to reverse the outcome of his erroneous disciplinary proceeding, restore his reputation, expunge his disciplinary record, remove the record of his expulsion from his education file, permanently destroy any record of the complaint against him, readmit him to CCU for the Spring 2018 semester, allow him to withdraw from any courses he may have failed as a result of his expulsion, and find Defendant's rules, regulations, and guidelines unconstitutional as applied. *Id.* at ¶ 146.

On May 7, 2018, Defendant filed the instant motion to dismiss. On May 21, 2018, Plaintiff filed a response, and on May 24, 2018, Defendant filed a reply thereto. The matter is now ripe for the Court's consideration.

**Legal Standard**

"A motion filed under Rule 12(b)(6) challenges the legal sufficiency of a complaint . . . considered with the assumption that the facts alleged are true[.]" *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted). The Court measures the legal sufficiency by determining whether the complaint meets the Rule 8 standards for a pleading. *Id.* Rule 8 requires, in pertinent part, that a claim for relief contain a "statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). "Each allegation must be simple, concise, and direct." Fed. R. Civ. P. 8(d)(1).

When reviewing a motion under Rule 12(b)(6), the Court must "accept all well-pleaded

4

allegations in the plaintiff's complaint as true and draw all reasonable factual inferences from those facts in the plaintiff's favor." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). However, the Court need not accept as true allegations that are contradicted by exhibits to the complaint. *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (citation omitted). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.* at 563. A complaint need not assert "detailed factual allegations[;]" however, it must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" will not suffice. *Id. at* 555 (citations omitted). Furthermore, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim has "facial plausibility" where the pleading "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## **Discussion**

Defendant moves to dismiss the complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Mot. to Dismiss at 1 [ECF No. 6]. First, with respect to the Title IX causes of action, Defendant contends that there "are no well-pleaded allegations in the Complaint to demonstrate an anti-male bias in Defendant's decision to permanently dismiss Plaintiff as a student." Mem. in Supp. of Mot. to Dismiss at 9 [ECF No. 6-1]. Second, for the state law causes of action, Defendant asserts sovereign immunity, arguing those claims are barred by the Eleventh Amendment of the United States Constitution. *Id.* at 19. Third, with respect to the declaratory relief Plaintiff seeks

5

for the alleged Title IX violations, Defendant claims that the Federal Declaratory Judgment Act does not create its own substantive cause of action, so if the Court dismisses the Title IX claims, then it should likewise dismiss this equitable relief. *Id.* at 22–23. The Court examines each of these contentions in turn.

**I.     Title IX**

Title IX provides in pertinent part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). "Title IX unquestionably prohibits federally supported educational institutions from practicing discrimination on the basis of sex." *Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 132 F.3d 949, 957 (4th Cir. 1997), *rev'd en banc on other grounds*, 169 F.3d 820 (4th Cir. 1999). Title IX is enforceable through an implied private right of action for monetary damages and injunctive relief. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 703 (1979) ("We have no doubt that Congress intended to create Title IX remedies comparable to those available under Title VI and that it understood Title VI as authorizing an implied private cause of action for victims of the prohibited discrimination."). "The Fourth Circuit has advised that 'Title VII, and the judicial interpretations of it, provide a persuasive body of standards to which [the Court] may look in shaping the contours of a private right of action under Title IX.'" *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 764 (D. Md. 2015) (quoting *Preston v. Virginia ex rel. New River Cmty. Coll.*, 31 F.3d 203, 207 (4th Cir. 1994)).

*Yusuf v. Vassar College* was the first case among the circuit courts to recognize a private Title IX cause of action on the grounds that a college's disciplinary proceeding was improperly motivated

6

by the accused's gender. 35 F.3d 709 (2d Cir. 1994). District courts and other circuit courts[2] have used *Yusuf* as a framework for similar cases, including the Fourth Circuit, the District of South Carolina, and other district courts in the Fourth Circuit. *See Brzonkala*, 132 F.3d 949 (4th Cir.); *Doe v. Univ. of S.C.*, C/A No. 3:18-161-TLW-PJG, 2018 WL 1215045 (D.S.C. Feb. 12, 2018), *adopted by* 2018 WL 1182508 (D.S.C. Mar. 6, 2018); *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748 (D. Md. 2015); *Doe v. Rector & Visitors of George Mason Univ.*, 132 F. Supp. 3d 712 (E.D. Va. 2015).[3] In the present case, both parties rely on the theories adopted in *Yusuf*, so the Court assumes the *Yusuf* framework without speculating on its correctness or other possible theories of Title IX liability.

Under the *Yusuf* framework, there are two theories on which such an action can proceed: erroneous outcome and selective enforcement. *Id.* at 715–16. Under the former, "the claim is that the plaintiff was innocent and wrongly found to have committed an offense." *Id.* at 715. Under the latter, the plaintiff alleges that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.* "Plaintiffs may plead in the alternative that they are in both categories, but in neither case do wholly conclusive allegations suffice for purposes of Rule 12(b)(6)." *Id.* (citation omitted). In the present case, Plaintiff bases his

---

[2] The First, Fourth, Fifth, Sixth, and Eleventh Circuits have discussed the Second Circuit's *Yusuf* framework. In one recent case, the First Circuit has used the framework without expressly adopting it based on the parties' agreement to use it. *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 90 (1st Cir. 2018). The Fourth Circuit has used it in one opinion that was subsequently vacated on other grounds. *Brzonkala*, 132 F.3d 949. The Fifth Circuit has used the framework in one case based on the parties' reliance on it. *Plummer v. Univ. of Hous.*, 860 F.3d 767, 777–78 (5th Cir. 2017). The Sixth Circuit has recently adopted the framework in one published case. *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018). The Eleventh Circuit has recently "assume[d]" the framework in one case without expressly adopting it. *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018). The United States Supreme Court has not provided a framework.

[3] *Brzonkala* appears to be the only case before the Fourth Circuit—and *Doe v. University of South Carolina* the only case in the District of South Carolina—to have addressed Title IX under similar facts. It is important to note that the Fourth Circuit, *en banc*, vacated the opinion in *Brzonkala* on other constitutional grounds and did not address the panel's opinion with respect to Title IX. 169 F.3d 820, 889 (4th Cir. 1999). Accordingly, there is no binding authority on this matter.

7

claim on erroneous outcome theory, which "has been widely accepted" since *Yusuf*. *Doe v. Rector*, 132 F. Supp. at 732; Resp. to Mot. to Dismiss at 3, 10–11 [ECF No. 8].

### A. Erroneous Outcome

A plaintiff claiming erroneous outcome must allege: (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) "a particularized . . . causal connection between the flawed outcome and gender bias." *Yusuf* at 715; *see also Doe v. Rector*, 132 F. Supp. at 732 (Eastern District of Virginia case citing *Yusuf*); *Doe v. Univ. of S.C.*, 2018 WL 1215045, at *7 (District of South Carolina case citing *Rector*); *Doe v. Salisbury Univ.*, 123 F. Supp. at 766 (District of Maryland case citing *Yusuf*). For the first element, "[i]f no such doubt exists based on the record before the disciplinary tribunal, the claim must fail." *Yusuf* at 715. The pleading burden on this element "is not heavy," and it is sufficient to allege "particular evidentiary weaknesses behind the finding of an offense such as motive to lie on the part of the complainant or witnesses, particularized strengths of the defense, . . . other reason to doubt the veracity of the charge[,] [or] particular procedural flaws affecting the proof." *Id.* For the second element requiring "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding," such allegations "can be of the kind that are found in the familiar setting of Title VII cases." *Id.* (citations omitted). "Such allegations might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.* "[S]ome allegations, such as statements reflecting bias by members of the tribunal, may suffice both to cast doubt on the accuracy of the disciplinary adjudication and to relate the error to gender bias." *Id.* However, "allegations of a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome combined with a conclusory allegation

8

of gender discrimination is not sufficient to survive a motion to dismiss." *Id.*; *Brzonkala*, 132 F.3d at 962 (citing *Yusuf* at 715).

In moving to dismiss Plaintiff's Title IX claims, Defendant argues that Plaintiff has failed to plead sufficient facts to support either element. Mem. in Supp. of Mot. to Dismiss at 9, 13. In response, Plaintiff contends he has pled his allegations "in excruciating detail demonstrating . . . plausible legal theories and inferences which support gender bias." Resp. to Mot. to Dismiss at 3.

### B. Accuracy of Plaintiff's Disciplinary Proceeding

In this case, Plaintiff has alleged that his disciplinary proceeding was flawed because he is innocent of the sexual misconduct charge against him as his encounter with Jane Doe was consensual, her alcohol consumption did not impair her ability to consent to sex, and the Conway PD and state prosecutor had insufficient evidence to charge him with a crime. Compl. at ¶¶ 9, 11, 47–52, 62–63. Furthermore, Plaintiff alleges particular facts that policies and procedures were not followed when Jane Doe appealed and, despite this, an appeal panel convened and overturned the first panel's findings of Plaintiff's innocence without due regard for the evidence. *Id.* at ¶¶ 22–23, 25–27, 69–70, 72, 87, 93.

At this motion-to-dismiss stage of the case, where all reasonable inferences must be drawn in Plaintiff's favor, these allegations are sufficient to cast some articulable doubt on the accuracy of the outcome of Defendant's disciplinary proceeding against Plaintiff. *See Doe v. Rector*, 132 F. Supp. at 732 (finding that plaintiff satisfied first element by alleging that university failed to consider witness statements, give deference to initial disciplinary panel's opinion, adhere to its own appellate rules, make a reliable credibility determination, afford plaintiff the ability to oppose the granting of an appeal, and provide a neutral arbiter without prior involvement in the case). Accordingly, these allegations satisfy the first element of Plaintiff's erroneous outcome claim.

9

## C. Causal Connection Between Flawed Outcome and Gender Bias

To satisfy the second element of his erroneous outcome claim, Plaintiff must plead "particular circumstances suggesting that gender bias was a motivating factor" behind the appeal panel's erroneous finding. *Yusuf* at 715. Defendant contends the complaint lacks well-pleaded allegations of anti-male bias. Mem. in Supp. of Mot. to Dismiss 13–18.

In the complaint, Plaintiff alleges that: (1) Byington capriciously ordered a second hearing because he did not like the decision of the first panel, even though there was no evidence to reconvene a hearing, constituting "anti-male gender bias," Compl. at ¶¶ 28–30; (2) the appeal panel was not duly constituted because there were no students in the panel as required by Defendant's Student Code, evidencing . . . anti-male gender bias," *id.* at ¶ 31; (3) Overton "engaged in odd faculty-student conduct towards [Plaintiff]" by having weekly mentoring meetings with Plaintiff in his office from January to July 2016, buying dinner and a $300 suit for Plaintiff during the mentorship, and taking primary care of Plaintiff while he was hospitalized from a car accident, all of which "can be inferred as possible inappropriate conduct towards a student," *id.* at ¶¶ 65–66; (4) Plaintiff "spurned" Overton, which "can generate an anti-male gender bias," *id.* at ¶ 66; and (5) "there has been other disparate favorable treatment of Jane Doe demonstrating anti-male gender bias" because Jane Doe was not punished for underage drinking, showing a picture of confidential witness statements to other CCU students, and contacting Plaintiff's church about the alleged sexual assault, *id.* at ¶¶ 73–74.

Defendant contends these allegations simply show a flawed proceeding, not anti-male gender bias. Mem. in Supp. of Mot. to Dismiss at 13–16. However, Plaintiff further alleges widespread anti-male bias at CCU, asserting that: (1) Defendant "has created an environment in which an accused male student is effectively denied fundamental due process by being prosecuted . . . under . . . a presumption

10

of guilt," Compl. at ¶ 92; (2) Defendant's "guidelines and regulations disproportionately affect the male student population of the [CCU] community as a result of the higher incidence of female complainants of sexual misconduct against male complainants," *id.* at ¶ 96; and (3) "male respondents in sexual misconduct cases at [CCU] are discriminated against solely on the basis of sex[,] [and] . . . are invariably found guilty, regardless of the evidence, or lack thereof," *id.* at ¶ 97.

With respect to the first and third allegations above that Defendant treats accused male students under a presumption of guilt on the basis of their gender, discriminates against them in sexual misconduct cases, and invariably finds them guilty regardless of the evidence, these types of allegations were sufficient to survive a motion to dismiss in *Yusuf*. *See* 35 F.3d at 715–16 ("We believe that Yusuf's complaint suffices to survive a motion to dismiss . . . . The allegations in support of the Title IX claim do more than merely recite the pleader's conclusion that the complained-of conduct was discriminatory. Instead, the complaint alleges events that, if proven, would support an inference of discrimination.") ("Similar allegations, if based on race in employment decisions, would more than suffice in a Title VII case, and we believe they easily meet the requirements of Title IX. They go well beyond the surmises of the plaintiff as to what was in the minds of others and involve probable events that in the aggregate would allow a trier of fact to find that gender affected the outcome of the disciplinary proceeding.") ("The allegation that males invariably lose when charged with sexual harassment at Vassar provide a verifiable causal connection.") ("Whether Yusuf will be able to prove what he has alleged and persuade a trier that his punishment was the result of gender bias is, of course, for future proceedings."). Plaintiff appears to pattern his allegations based on language from *Yusuf*. *Compare Yusuf* at 716 (plaintiff alleging "males accused of sexual harassment at Vassar are . . . invariably found guilty, regardless of the evidence, or lack thereof."), *with* Compl. at ¶ 97 (Plaintiff

11

alleging "male respondents in sexual harassment cases at [CCU] are . . . invariably found guilty, regardless of the evidence, or lack thereof.").

However, Defendant questions whether such allegations are sufficient in a post-*Twombly* and *Iqbal* landscape, as another district court in this circuit has questioned. Mem. in Supp. of Mot. to Dismiss at 12. According to a case from the Eastern District of Virginia, although similar allegations "passed muster in *Yusuf* . . . , mimicking the *Yusuf* plaintiff's allegations is not necessarily sufficient to survive a motion to dismiss" because under *Twombly* and *Iqbal*, "both decided after *Yusuf*," a plaintiff "must plead facts sufficient to support a plausible inference of liability." *Doe v. Rector*, 132 F. Supp. at 732. Thus, the question here is whether Plaintiff's allegations about widespread anti-male bias are "plausible" such that they satisfy the pleading requirements of *Twombly* and *Iqbal*. In response, Plaintiff points out that the records to support these allegations are within Defendant's control, so discovery is needed. Resp. to Mot. to Dismiss at 10.

The Court believes that Plaintiff's allegations are sufficient at this stage. Furthermore, the Court does not believe that Plaintiff should be barred from discovery because he is unable to give more precise details about this alleged widespread gender bias at CCU; as he points out, such evidentiary materials are within Defendant's control. Given the confidential nature of disciplinary proceedings against students accused of sexual misconduct, it is difficult to imagine how Plaintiff could plead the existence of such proceedings in greater factual detail. The Court finds that Plaintiff has pled or alleged "particular circumstances suggesting that gender bias was a motivating factor" behind Defendant's allegedly erroneous finding. Whether the evidence Plaintiff culls from discovery is sufficient to support his allegations may be a question for future proceedings. Accordingly, the Court denies Defendant's motion to dismiss with respect to Plaintiff's Title IX claims.

## II. Eleventh Amendment Immunity

Defendant moves to dismiss the state law causes of action under Rule 12(b)(6)[4] for failure to state a claim upon which relief can be granted on the grounds of sovereign immunity and the Eleventh Amendment. Plaintiff fails to address sovereign immunity, instead claiming that the Court has discretion to exercise supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. Resp. to Mot. to Dismiss at 11. This argument lacks merit because § 1367's grant of jurisdiction "does not extend to claims against nonconsenting state defendants." *Raygor v. Regents of Univ. of Minn.*, 534 U.S. 533, 541–42 (2002).

### A. Legal Standard

Rule 12(h)(3) of the Federal Rules of Civil Procedure mandates dismissal of a claim if the Court "determines at any time that it lacks subject-matter jurisdiction." Fed. R. Civ. P. 12(h)(3). The Eleventh Amendment restricts federal court jurisdiction by virtue of the states' sovereign immunity. *See* U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to . . . ."); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984) ("[T]he principle of sovereign immunity is a constitutional limitation on the federal judicial power established in Art. III.").

### B. Eleventh Amendment Immunity & Subject-Matter Jurisdiction

The Eleventh Amendment bars suits in federal court against a state by its own citizens, citizens of other states, and citizens of other countries. U.S. Const. amend. XI; *Hans v. Louisiana*, 134 U.S. 1,

---

[4] With respect to dismissal on Eleventh Amendment grounds, the Fourth Circuit "has not definitively ruled whether [this] is properly based on Rule 12(b)(1) or 12(b)(6)." *Kirby v. N.C. State Univ.*, No. 5:13-CV-850-FL, 2015 WL 1036946, at *3 (E.D.N.C. Mar. 10, 2015) (citation omitted); *see Andrews v. Daw*, 201 F.3d 521, 525 n.2 (4th Cir. 2000) (citations omitted) ("Our cases have been unclear on whether a dismissal on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1).").

13

15 (1890). Eleventh Amendment immunity also extends to "arms of the State" and state employees acting in their official capacity. *Harter v. Vernon*, 101 F.3d 324, 337 (4th Cir. 1996) (citing *Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).

Nevertheless, a state may waive its Eleventh Amendment immunity, but only in the most unequivocal terms. "[W]hether a particular set of state laws, rules, or activities amounts to a waiver of the State's Eleventh Amendment immunity is a question of federal law." *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 623 (2002). The "test for determining whether a State has waived its [Eleventh Amendment] immunity from federal-court jurisdiction is a stringent one." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985). A state is deemed to have waived its immunity "only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (citation omitted). For waiver to be effective, the state must expressly agree to be sued in federal court. *See Kennecott Copper Corp. v. State Tax Comm'n*, 327 U.S. 573, 579–80 (1946) (holding state statute authorizing suits against the state 'in any court of competent jurisdiction' as inadequate to waive Eleventh Amendment immunity). For a state statute to waive Eleventh Amendment immunity, "it must specify the State's intention to subject itself to suit in *federal court*." *Scanlon*, 473 U.S. at 241; *see Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 306–08 (holding state statute authorizing suits against an arm of the State of New York and venue in a federal district court as adequate to waive Eleventh Amendment immunity).[5]

---

[5] An additional type of waiver exists where a state removes a case involving state law claims against it to federal court. *See Lapides*, 535 U.S. at 624 (holding that removal of a case from state court to federal court by an arm of the State of Georgia constituted waiver where there were state tort law claims against the governmental entity

Pursuant to the South Carolina Tort Claims Act, S.C. Code §§ 15-78-10 through 15-78-200, (the "SCTCA"), South Carolina has not waived its Eleventh Amendment immunity for lawsuits in federal court, consenting to suit only in South Carolina state court to the extent that it has waived tort claims against it. S.C. Code § 15-78-20(e) ("Nothing in this chapter is construed as a waiver of the state's or political subdivision's immunity from suit in federal court under the Eleventh Amendment to the Constitution of the United States nor as consent to be sued in any state court beyond the boundaries of the State of South Carolina."); *see Introini v. S.C. Nat'l Guard*, 828 F. Supp. 391, 395 (D.S.C. 1993) (holding that the SCTCA makes state agencies subject to suit in state court under certain circumstances, but the South Carolina legislature has expressly preserved the state's immunity to suit in federal court to the full extent available under the Eleventh Amendment). The Court must determine whether Defendant is an arm of the state of South Carolina entitled to Eleventh Amendment immunity.

The Fourth Circuit uses a four-factor test to determine whether a party is an arm of the state entitled to Eleventh Amendment immunity: (1) the "most important consideration is whether the state treasury will be responsible for paying any judgment that might be awarded"; (2) whether the entity exercises a significant degree of autonomy from the state; (3) whether the entity is involved with local versus statewide concerns; and (4) how the entity is treated as a matter of state law. *Harter*, 101 F.3d at 337 (citing *Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n.*, 822 F.2d 456, 457 (4th Cir. 1987)). After *Ram Ditta* was decided, the United States Supreme Court announced that "arm of the state" inquiries should be guided by the Eleventh Amendment's "twin reasons" for existence:

---

and Georgia had statutorily waived its immunity to tort claims in state court). Here, unlike the Board of Regents in *Lapides*, Defendant has not controlled the forum of litigation; it was brought into federal court on state law and Title IX claims and subsequently raised the issue of Eleventh Amendment immunity in a motion to dismiss. Therefore, *Lapides*-type waiver is not implicated here.

15

"preventing judgments from depleting state treasuries, and maintaining the integrity retained by each State in our federal system." *Id.* (citing *Hess v. Port Auth. Trans-Hudson*, 513 U.S. 30, 47–48 (1994)). Following the decision in *Hess*, the Fourth Circuit held that *Hess* did not materially alter the Eleventh Amendment analysis formulated in *Ram Ditta*, stating that "if the state treasury will pay the judgment, the entity is immune from suit, and the other *Ram Ditta* factors need not be considered." *Id.* at 339 (citing *Gray v. Laws*, 51 F.3d 426, 433–34 (4th Cir. 1995)). Conversely, if the Court determines that the state treasury will not pay the judgment, then "this most salient [state treasury] factor in Eleventh Amendment decisions weighs against a finding of immunity." *Id.* (quoting *Hess*, 513 U.S. at 48). In such a situation, although the Court "should consider the other *Ram Ditta* factors, *Hess* makes clear that the impact of the state treasury is generally determinative when the state will not have to pay for a judgment" because the "Eleventh Amendment's core concern is not implicated" both legally and practically. *Id.* (quoting *Hess*, 513 U.S. at 51).

In deciding whether public state universities are arms of the state, courts "[a]lmost universally . . . answer . . . in the affirmative." *Md. Stadium Auth. v. Ellerbe Becket, Inc.*, 407 F.3d 255, 262 (4th Cir. 2005) (citations omitted). The District of South Carolina has held that several of South Carolina's public colleges and universities are arms of the State entitled to Eleventh Amendment immunity. *See DeCecco v. Univ. of S.C.*, 918 F. Supp. 2d 471, 497 (D.S.C. 2013) (University of South Carolina); *Martin v. Clemson Univ.*, 654 F. Supp. 2d 410, 415 (D.S.C. 2009) (Clemson University); *Johnson v. S.C. State Univ.*, C/A/ No. 5:09-1421-MBS, 2009 WL 1834488, at *4 (D.S.C. June 24, 2009) (South Carolina State University); *von Fox v. Med. Univ. of S.C.*, Case No. 2:16-cv-179-RMG-MGB, 2016 WL 8732360, at *4 (D.S.C. Feb. 12, 2016) (citations omitted), *adopted by* 2016 WL 693525 (Medical University of South Carolina). The Court examines the *Ram Ditta* factors to determine if Defendant

16

is an arm of the State of South Carolina, particularly whether its treasury will be responsible for paying any judgment against Defendant.

With respect to the first and fourth factors (state treasury's liability and how state law treats the entity), under the plain language of the SCTCA defining "state" and "agency", CCU clearly falls within the ambit of South Carolina's Eleventh Amendment immunity. "State" is defined as "the State of South Carolina and any of its offices, agencies, authorities, departments, commissions, boards, divisions, instrumentalities . . . and *institutions, including state-supported* government health care facilities, *schools, colleges, universities, and technical colleges*." S.C. Code §§ 15-78-30(a) (emphasis added). Similarly, "agency" is defined as "the individual office, agency, authority, department, commission, board, division, instrumentality, or institution, *including a state-supported governmental* health care facility, *school, college, university*, or technical college, which employs the employee whose act or omission gives rise to a claim under [the SCTCA]." S.C. Code § 15-78-30(a), (e) (emphasis added). When the South Carolina legislature established CCU from Coastal Carolina College—which had been a four-year regional branch of the University of South Carolina—it did so by stating that CCU "shall be a separate and distinct *institution* of higher learning *of the State of South Carolina*." S.C. Code § 56-13-100 (emphasis added). Thus, South Carolina law treats CCU as part of the State of South Carolina. With respect to liability, the SCTCA makes the State and its agencies liable for certain torts, providing recovery of damages up to $300,000 per occurrence on state law tort claims. S.C. Code. § 15-78-120(a)(1). Given the SCTCA's language treating CCU as part of the State, the South Carolina treasury would be liable for Defendant's alleged torts. Thus, this first—and most significant factor—as well as the fourth factor, weigh heavily in favor of finding CCU an arm of South Carolina. The Court briefly addresses the second and third factors (degree of autonomy from the State and local versus statewide

17

concerns).

With respect to the second factor, the Fourth Circuit instructs the Court consider "who appoints the entit[ies'] directors or officers, who funds the entit[ies], and whether the State retains a veto over the entit[ies'] actions." *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 668 (4th Cir. 2015) (citation omitted). "Also relevant to the autonomy inquiry is the determination whether the entity has the ability to contract, sue and be sued, and purchase and sell property, and whether it is represented in legal matters by the state attorney general." *Id.* (citation omitted). South Carolina law provides that CCU's board of trustees is composed of the governor or his designee and sixteen members, fifteen of whom are elected by the South Carolina legislature and one of whom is appointed by the governor. S.C. Code § 59-136-110. The CCU board of trustees has various enumerated powers, including the ability to make contracts, purchase and sell real estate, make bylaws and regulations for the management of its affairs, fix tuition fees, and confer degrees. S.C. Code § 59-136-130. This factor weighs slightly in favor of finding CCU an arm of South Carolina because although South Carolina has endowed the CCU board of trustees with powers of governance, management, and operation of CCU, it is nevertheless an alter ego of the State as evinced by the board's composition of the governor, and governor and legislature-elected members.

Finally, with respect to the third factor, the Fourth Circuit has held that "[h]igher education is an area of quintessential state concern and a traditional state governmental function." *Ellerbe Becket*, 407 F.3d at 265. As a public institution of higher learning, CCU's existence is not confined to local interests but rather to statewide interest. Therefore, this factor weighs in favor of finding CCU an arm of the South Carolina.

In conclusion, the *Ram Ditta* factors all weigh in favor of finding Defendant an arm of South

Carolina. South Carolina has clearly retained its sovereign immunity under the Eleventh Amendment to the fullest extent on behalf of itself and its arms, which includes CCU. *See* S.C. Code § 15-78-20(a) ("[I]t is declared to be the public policy of the State of South Carolina that the State, and its political subdivisions, are only liable for torts within the limitations of this chapter and in accordance with the principles established herein."); S.C. Code § 15-78-20(a) (providing that the South Carolina legislature "intends to grant the State, its political subdivisions, and employees, while acting within the scope of official duty, immunity from liability and suit for any tort except as waived by this chapter"). Accordingly, Defendant is an arm of the State of South Carolina entitled to Eleventh Amendment immunity with respect to Plaintiff's state law claims against it. As such, Defendant's motion to dismiss the state law claims with respect to Eleventh Amendment immunity is granted, and those claims are dismissed without prejudice. *See Smythe v. Stirling*, Civil Action No. 0:18-cv-01218-RBH, 2018 WL 6444374 at *2 n.5 (D.S.C. Dec. 10, 2018) (citations omitted) (dismissing state law claims without prejudice because dismissal was based on Eleventh Amendment immunity).

### III.    Declaratory Relief

Lastly, Defendant moves the Court to dismiss Plaintiff's claim for the declaratory relief he seeks under the Declaratory Judgment Act, 28 U.S.C. § 2201, (the "DJA") if the Court dismisses the Title IX causes of action. Mem. in Supp. of Mot. to Dismiss at 22–23. Defendant points out that the DJA "does not create its own substantive cause of action." *Id.* at 22. The Court agrees that the DJA does not create its own substantive cause of action; rather, it "is 'remedial only, and is not itself a basis for federal subject matter jurisdiction.'" *Volvo GM Heavy Truck Corp. v. U.S. Dep't of Labor*, 118 F.3d 205, 210 (4th Cir. 1997) (quoting *City Nat'l Bank v. Edmisten*, 681 F.2d 942, 945 n.6 (4th Cir. 1982)). However, since Plaintiff's Title IX claims survive the motion to dismiss, the declaratory relief Plaintiff seeks

based on his Title IX claims likewise survives.

## Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendant's motion to dismiss [ECF No. 6], granting it with respect to the state law claims but denying it with respect to the Title IX and gender discrimination claims. Because the Court lacks subject-matter jurisdiction over the state law claims, the Court dismisses those claims without prejudice.

**IT IS SO ORDERED.**

Florence, South Carolina
January 9, 2019

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge