IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| John Doe,<br><br>        Plaintiff,<br><br>v.<br><br>Coastal Carolina University,<br><br>        Defendant. | Case No.: 4:18-cv-00268-SAL<br><br>**OPINION AND ORDER** |

This matter is before the Court on Defendant Costal Carolina University's motion for summary judgment. [ECF No. 94]. Plaintiff filed a response to the motion, and Defendant replied. [ECF Nos. 114, 115]. The Court held a hearing on February 25, 2021. [ECF No. 126]. Therefore, the motion is ripe for ruling. Based on the parties' filings and their representations at the hearing, the sole issue before the Court is Plaintiff's Title IX claim based on an erroneous outcome theory.

## BACKGROUND

Plaintiff, John Doe, attended Coastal Carolina University ("the University") for two consecutive semesters, beginning in spring 2016 and ending in fall 2016. [ECF No. 114 p.1]. On August 27, 2016, Plaintiff and Jane Doe attended an off-campus pool party. *Id.* Plaintiff left the pool party with Jane Doe and engaged in sex with her. *Id* at 2. Shortly thereafter, Plaintiff's roommate entered Jane Doe's room and engaged in sex with her. *Id.* Later that evening, Jane Doe reported to the University that Plaintiff and his roommate sexually assaulted her. [ECF No. 94-1 p.1].

1

Witness testimony about Jane Doe's level of intoxication at the pool party varied. *Id.* Plaintiff contends that he and Jane Doe engaged in consensual sexual intercourse. *Id.* Jane Doe alleged she was incapacitated due to alcohol consumption at the time and was therefore unable to consent to sex. [ECF No. 94-1 p.2]. The University investigated Jane Doe's allegations. *Id.* Dean Travis E. Overton conducted the investigation. *Id.* Overton interviewed witnesses. *Id.* Some of the witnesses corroborated Jane Doe's allegations while others contradicted them. *Id.*

On December 6, 2016, the University convened a hearing panel to determine whether Plaintiff and his roommate violated University policy when they engaged in sex with Jane Doe. *Id.* After a hearing, the panel found that Plaintiff's roommate violated University policy and dismissed him from the University. *Id.* The panel found that Plaintiff had not violated University policy. [ECF No. 114 p.3].

Jane Doe appealed the decision to the proper appellate authority, Ralph J. Byington. *Id.* Prior to Byington's decision, the University's Title IX coordinator Denise Perez reviewed Jane Doe's appeal and the investigation records. *Id.* She wrote a report opining that Plaintiff violated University policy. *Id.* Byington granted Jane Doe's appeal and ordered a new panel to hear Jane Doe's sexual misconduct allegations against the Plaintiff. [ECF No. 94-1 p.3].

The second hearing was held on March 31, 2017. *Id.* At the time of the second hearing, Plaintiff was no longer a student at the University. *Id.* The second hearing panel found Plaintiff violated University policy when he engaged in sex with Jane Doe and permanently dismissed him from the University. *Id.* On January 31, 2018, Plaintiff filed this lawsuit. [ECF No. 1]. Plaintiff asserted causes of action under Title IX, the Declaratory Judgment Act, and common law. *Id.* The University filed a motion to dismiss, which was granted as to the common law causes of action, leaving only the federal claims. [ECF Nos. 6, 13].

**LEGAL STANDARD**

Summary judgment is appropriate if a party "shows that there is no genuine dispute as to any material fact" and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities in favor of the nonmoving party." *HealthSouth Rehab. Hosp. v. American Nat'l Red Cross*, 101 F.3d 1005, 1008 (4th Cir. 1996). The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party makes this threshold demonstration, the non-moving party may not rest upon mere allegations or denials averred in the pleading, but rather must, by affidavits or other means permitted by the Rule, set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56; *see also Celotex Corp.*, 477 U.S. at 323. A party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

**DISCUSSION**

**I.     Title IX**

Title IX "prohibits federally supported educational institutions from practicing discrimination on the basis of sex." *Brzonkala v. Va. Polytechnic Inst. & State Univ.*, 132 F.3d 949, 957 (4th Cir. 1997), *rev'd en banc on other grounds*, 169 F.3d 820 (4th Cir. 1999). It protects both students and employees of federally funded educational programs and provides: "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to

3

discrimination under any education program or activity receiving Federal financial assistance. 20 U.S.C. § 1681(a). At issue here is alleged discrimination against a male student with respect to University discipline.

While the Fourth Circuit Court of Appeals has not expressly adopted a test for student disciplinary Title IX claims, it recently recognized and applied the doctrinal tests employed by the Second Circuit Court of Appeals. *See Doe 2 by and through Doe 1 v. Fairfax Cty. Sch. Bd*., No. 19-1702, 19-171, 2020 WL 6158091, at *1 (4th Cir. Oct. 21, 2020) (*per curiam*) (citing *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994) and noting the parties' agreement that the plaintiff in that case could "attempt to recover on his sex discrimination claim under either an erroneous outcome theory or a selective enforcement theory"). Further, given the lack of binding Fourth Circuit authority in this area, this Court applied the Second Circuit's *Yusuf* framework in evaluating the Plaintiff's motion to dismiss.[1] *See Doe v. Coastal Carolina Univ*., 359 F. Supp. 3d 367, 374 (D.S.C. 2019) (citing cases looking to and relying on *Yusuf*); *see also id.* at n.3 (noting "there is no binding authority on this matter"). Thus, the Court sees no reason to depart from applying the same framework here.

Plaintiff urges the Court to consider the approach in *Doe v. Purdue University*, 928 F.3d 652 (7th Cir. 2019). In *Purdue*, then Judge now Justice Amy Coney Barrett articulated a different standard in evaluating a motion to dismiss. *Id.* at 667. The court stated:

> We see no need to superimpose doctrinal tests on the statute. All of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student. We prefer to ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against John "on the basis of sex"?

*Id.*

---

[1] The Honorable R. Bryan Harwell authored the Order granting in part and denying in part Defendant's motion to dismiss. The case was subsequently reassigned. [ECF No. 59].

First, this Court is bound by, and takes its cues from, the Fourth Circuit Court of Appeals. *See Jones v. Tyson Foods, Inc.*, 378 F. Supp. 2d 705, 709 (E.D. Va. 2004), *aff'd sub nom. Jones v. Tyson Foods*, 126 F. App'x 106 (4th Cir. 2005) ("[A] district court in a circuit owes obedience to a decision of the court of appeals in that circuit. . ."). Because the Fourth Circuit recently recognized and applied the *Yusuf* framework in *Doe 2*, the Court finds that—as was the case for Defendant's motion to dismiss—the *Yusuf* framework is the applicable law. *Doe 2*, 2020 WL 6158091, at *1. Further, the *Purdue* standard is arguably only a pleading standard. *See Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020) (describing the *Purdue* standard as a pleading standard). At the summary judgment stage, the Court finds that the more robust doctrinal test in *Yusuf* is more appropriate.

## II.     Erroneous Outcome

*Yusuf* recognized two theories on which an action related to a college disciplinary matter may proceed: (1) erroneous outcome and (2) selective enforcement. 35 F.3d at 715–16. Plaintiff bases his claim on the erroneous outcome theory. *See* [ECF No. 114 p.5]. An erroneous outcome claim asserts that "the plaintiff was innocent and wrongly found to have committed an offense." *Id.* at 715. "To prevail on an erroneous outcome claim, a plaintiff must (1) assert that he 'was innocent and wrongly found to have committed an offense'; (2) establish 'facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding,' and (3) demonstrate 'particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.'" *Doe 2*, 2020 WL 6158091, at *1 (citing *Yusuf*, 35 F.3d at 715). The parties do not dispute that Plaintiff asserts he was innocent and wrongly found to have committed an offense. *See* [ECF No. 94 p.21]. Therefore, to prevail on his erroneous outcome claim, Plaintiff must (1) establish facts sufficient to cast some articulable doubt on the accuracy of the outcome of

his disciplinary proceedings and (2) demonstrate particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding.

      A.      **Articulable Doubt**

Construing all inferences and ambiguities in favor of the nonmoving party, the Court finds that Plaintiff has raised genuine issues of material fact that cast articulable doubt on the accuracy of the outcome of his disciplinary proceedings. A plaintiff establishes articulable doubt by providing evidence of the procedural flaw, evidentiary weaknesses, strengths of the defense, or "other reason[s] to doubt the veracity of the charge." *Yusuf*, 35 F.3d at 715. The Court need not pass judgment on Plaintiff's guilt, only whether a reasonable jury could doubt his guilt. *Doe v. Rollins Coll.*, No. 618CV1069ORL37LRH, 2020 WL 8409325, at *7 (M.D. Fla. July 13, 2020).

The fact that Plaintiff was found not guilty in his first hearing, viewed in the light most favorable to the Plaintiff, raises articulable doubt as to his guilt. The University convened a hearing panel to determine whether Plaintiff violated University policy when he engaged in sex with Jane Doe. The panel found that he did not. This, for purposes of summary judgment, raises articulable doubt as to his guilt. The panel heard Jane Doe's allegations and the University's findings as set forth in Dean Overton's report. Plaintiff, M.V., and Jane Doe presented to the panel. At the conclusion of the presentations, the panel moved into deliberations. After deliberating, the panel found Plaintiff was not in violation of University policy. Because the first panel came to this conclusion, the Court cannot find, as a matter of law, that a reasonable jury could not do the same.

Defendant argues that there is a mountain of evidence to support Plaintiff's guilt. [ECF No. 115 p.5]. However, this mountain of evidence did not convince the first panel that Plaintiff violated university policy. Despite the evidence presented, the first panel doubted Plaintiff's guilt. Defendant also argues that the inconsistent outcomes of the first and second hearings are not

surprising and can be explained. *Id.* at 7. Defendant offers many persuasive reasons that the two hearings may have resulted in different outcomes. *Id.* The Court agrees that the nature of sexual assault cases makes them particularly susceptible to different outcomes. Sexual assault cases can become credibility contests, and this means that reasonable finders of fact could come to different conclusions. For this very reason, just as the first panel did, a reasonable jury might doubt Plaintiff's guilt. This showing is sufficient to raise genuine issues of material fact that cast articulable doubt on the outcome of Plaintiff's disciplinary proceeding.[2]

### B.   Gender Bias

Viewing the facts in the light most favorable to Plaintiff, the Court finds that he has raised genuine issues of material fact regarding a causal connection between the claimed erroneous outcome and gender bias. "Bias can be shown through evidence such as statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Doe v. Rollins Coll.*, 2020 WL 8409325, at *9 (citing *Yusuf*, 35 F.3d at 715). In support of his position that anti-male bias animated the proceedings, Doe points to the following: (1) Maxient[3] entries in which University officials communicated with Jane Doe and her mom discussing "The Hunting Grounds"; (2) different treatment of Plaintiff versus Jane Doe by student affairs with supportive measures; (3) the Student Conduct panel member's "improper discussion" with Jane Doe and "subsequent admonition" from the board chair; (4) "making up an out of process review on appeal that benefited Defendant;" and (5) "the University's data that all appeals by male respondents were misconduct cases." [ECF No.

---

[2] Plaintiff offers other evidence that he claims casts articulable doubt on the proceedings. One argument is that Dean Overton had a conflict of interest based on his relationship with the Plaintiff that made the proceedings unfair. Having found that the first hearing alone is sufficient to cast articulable doubt on Plaintiff's guilt, the Court need not consider the other arguments.

[3] Maxient is a communication software that documented the University officials' interactions with Jane Doe during the pendency of her claim.

114 p.13]. Plaintiff also argues that, in addition to this evidence related to Plaintiff's particular case, his claim is cast against the backdrop of the Department of Education's "Dear Colleague" letter. *Id.* at 14. The Dear Colleague letter, Plaintiff argues, gave universities a financial motive for discrimination against males in sexual assault allegations. *Id.*

### 1. The Dear Colleague Letter

Plaintiff casts his Title IX claim against the backdrop of a 2011 "Dear Colleague" letter from the U.S. Department of Education to colleges and universities. *See* United States Department of Education, Office of the Assistant Secretary for Civil Rights, Dear Colleague Letter (2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html. As the *Purdue* court explained:

> That letter ushered in a more rigorous approach to campus sexual misconduct allegations by, among other things, defining "sexual harassment" more broadly than in comparable contexts, mandating that schools prioritize the investigation and resolution of harassment claims, and requiring them to adopt a lenient "more likely than not" burden of proof when adjudicating claims against alleged perpetrators. The Department of Education made clear that it took the letter and its enforcement very seriously. And it warned schools that "[t]his Administration is committed to using all its tools to ensure that all schools comply with [T]itle IX so campuses will be safer for students across the country." In other words, a school's federal funding was at risk if it could not show that it was vigorously investigating and punishing sexual misconduct.

*Doe v. Purdue Univ.*, 928 F.3d 652, 668 (7th Cir. 2019) (citations omitted). Courts in other circuits have treated the Dear Colleague letter as relevant in evaluating the plausibility of a Title IX claim. *Id.* (citing *Doe v. Miami University*, 882 F.3d at 594 (6th Cir. 2018); *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018); *Doe v. Columbia Univ.*, 831 F.3d 46, 58 (2d Cir. 2016)). The rationale for the letter's relevance is as follows: the letter applied government pressure and threatened financial punishment in a way that could lead colleges to discriminate against men in their sexual assault adjudication processes. *See id.*

8

However, courts uniformly hold that the letter alone is not enough to show bias in a particular case. *See, e.g., Doe v. Baum*, 903 F.3d at 586 (stating that pressure from the Dear Colleague letter "alone is not enough to state a claim that the university acted with bias in a particular case"). Instead, the letter provides a backdrop that, when combined with other circumstantial evidence of bias in Plaintiff's proceeding, is relevant in deciding whether there is a genuine dispute of material fact for trial. *See Doe v. Purdue Univ.,* 928 F.3d 652, 669 (7th Cir. 2019) (evaluating the letter's importance in a motion to dismiss). Accordingly, the Court notes the relevant backdrop the letter provides, and turns to Plaintiff's evidence of bias in his particular case to determine whether a genuine issue for trial exists.

### 2.     The University Data

Plaintiff argues University data in sexual misconduct cases demonstrates a pattern of bias against male respondents. [ECF No. 114 p.13]. From January 1, 2014 through December 31, 2016, there were eight sexual misconduct investigations, complaints, or cases that resulted in a Student Conduct Board Hearing. [ECF No. 115-4 p.2]. In all eight cases, the accused were males. *Id.* at 3. There were three appeals from sexual misconduct cases during this time. *Id.* at 4. Two males appealed, and one female appealed. *Id.* Only the female's appeal was granted. *Id.*

Courts across the country and within this circuit refuse to infer gender bias based on statistical disparity. *See Doe v. Fairfax Cty. Sch. Bd.*, 403 F. Supp. 3d 508, 518–19 (E.D. Va. 2019) (stating that courts have rejected this kind of statistical evidence as sufficient to establish intentional gender discrimination); *Doe v. Trustees of Boston Coll.*, 892 F.3d 67, 92 (1st Cir. 2018) (finding that Boston College did not violate Title IX simply because "only male students [had] been accused of sexual assault" during the previous 10-year period); *Doe v. Oberlin Coll.*, 2019 WL 1439115 (N.D. Ohio Mar. 31, 2019), *appeal docketed*, No. 19-3342 ("In support of his claim of gender bias,

Plaintiff also alleges that, 'the *vast majority* of the Oberlin students ... accused of sexual misconduct are men.' This by itself is not indicative of discrimination or bias against men.") (6th Cir. Apr. 17, 2019); *Rossley v. Drake University*, 342 F. Supp. 3d 904, 929 (S.D. Iowa 2018) ("Courts have declined to infer a gender-based motive on the part of [school] officials from the disparity in gender among those who are accused of sexual assault, noting that schools are not responsible for which students choose to report sexual misconduct.") *aff'd*, 979 F.3d 1184 (8th Cir. 2020); *Doe v. Cummins*, 662 F. App'x 437, 454 (6th Cir. 2016) (unpublished) (reasoning there were "more innocent" causes for the gender disparity between male and female respondents in sexual-misconduct cases than gender bias); *Tsuruta v. Augustana Univ.*, No. 4:15-CV-04150-KES, 2015 WL 5838602, at *4 (D.S.D. Oct. 7, 2015) ("The fact that males are more often the subject of disciplinary (or criminal) proceedings stemming from allegations of sexual assault does not suggest that those proceedings are tainted by an improper motive."). These statistics, alone, are insufficient to support a finding of gender bias as a matter of law. *See Rossley*, 342 F. Supp. 3d at 929. However, they may provide context when combined with circumstantial evidence of bias in a particular case. To survive summary judgment, Plaintiff must put forward evidence of bias in his particular case.

### 3. Different Treatment of Plaintiff versus Jane Doe by Student Affairs and Related Maxient Entries

Plaintiff puts forward evidence that he and Jane Doe did not receive the same level of support from the university following Jane Doe's complaint. *See* [ECF No. 114 pp.10-11]. Plaintiff states that Assistant Dean for Student Advocacy and Intervention, Sara Peacock[4], communicated with Jane Doe on several occasions. *Id.* at 10. According to Plaintiff, her role may have been to provide supportive measures and serve as a conduit between the parties and the Student Conduct Office

---

[4] Sara Peacock is also a member of the Student Conduct Office.

regarding the process. *Id.* However, Plaintiff asserts that Peacock's communications reveal that she was more of an advocate for Jane Doe. She met with Jane Doe to review Title IX resources, facilitate counseling, and update her on the progress of the case. *Id.* at 11. Further, Plaintiff states that Jane Doe and her mother spoke with a university official identified as "DLP." *Id.* DLP explained that information from a criminal investigation can be helpful in a Title IX investigation. *Id.* During the same call, Jane Doe's mother asked DLP if she had seen the documentary "The Hunting Grounds." *Id.* The Hunting Grounds is a 2015 documentary detailing Title IX sexual misconduct investigations.[5]

By way of contrast, Plaintiff describes the support he received. *Id.* He describes his communication with the University as "perfunctory, with the sole purpose of scheduling meetings." *Id.* He states that he was not offered any support, counseling, or updates on the status of his case. *Id.* According to Plaintiff, the University only reached out to offer support after his father reached out and informed the University that his son was under extreme stress, physically ill, and experiencing headaches and migraines because of the situation. *Id.*

Plaintiff's evidence may demonstrate a victim-centered approach to providing support after the alleged sexual misconduct. However, nothing indicates this different approach had anything to do with gender. If anything, as noted by other courts, "the inference of pro-victim bias is an obvious alternative explanation that overwhelms any potential of gender bias." *Doe v. Rollins Coll.*, 2020 WL 8409325, at *9 (quoting *Rossley*, 342 F. Supp. 3d at 928); *see also Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d 1064, 1079 (D. Colo. 2017). Simply put, this is not different treatment for similarly situated students on the basis of gender. Plaintiff and Jane Doe were not similarly situated. Plaintiff was an alleged sexual assailant and Jane Doe was an alleged victim. This

---

[5] Plaintiff notes that "The Hunting Grounds" has sparked significant academic criticism. [ECF No. 114 p.11].

obvious difference is a legitimate basis for a different approach in support. Absent evidence of gender bias, Plaintiff's claim that he received different support from the University than Jane Doe is not, alone, enough to survive summary judgment.

### 4. The Student Conduct Panel Member's Discussion with Jane Doe

Plaintiff points to a conversation that occurred before the rehearing as evidence of gender bias. *Id.* at 12. The conversation is, according to Plaintiff, between "[a]n unidentified woman, presumably a member of the Student Conduct Board Panel" and Jane Doe. The conversation was as follows:

> Speaker 1: It's going to be 77 degrees.
> Speaker 2: That's what I heard. Beautiful day.
> [inaudible 00:46:42].
> Speaker 2: If my husband hasn't done any more home destruction before I get there, maybe we can do something tomorrow.
> Speaker 1: We have a campus tour tomorrow, so will be here quite early, hey?
> Speaker 2: I guess.
> Madison Knight: I work two jobs tomorrow.
> Speaker 2: Oh, I don't envy you at all. Where do you work?
> Madison Knight: Hmm?
> Speaker 2: Where do you get to work?
> Madison Knight: I work at Calli Baker's as a server. And then I also work in Medieval Times as a server.
> Speaker 2: Oh, my granddaughters love Medieval Times.
> Madison Knight: It's always fun.
> Speaker 2: I haven't been to the one here.
> Madison Knight: It's awkward though, because now I go to wait other tables and I'm like, "My lady." And I can't say that here. My lady, my Lord.
> Sir Chair: Let's refrain from talking to the defendant.
> Speaker 2: Sure.

[ECF No. 114-4 (rehearing audio 46:42-47:40)]. Plaintiff describes this interaction as "[o]ne of the most egregious acts of gender bias presented in the case. . ." [ECF No. 114 p.12]. The Court disagrees. This exchange of pleasantries before the rehearing was completely unrelated to

12

the substance of the hearing. Gender is not mentioned, even adjacently. The Court finds this conversation insufficient to support a finding of gender bias.

### 5. The Review Process on Appeal

Finally, Plaintiff argues that the review process on appeal is evidence of gender bias. *See id.* at 13. In some circumstances, Courts have found that a departure from typical adjudicatory or procedural norms might be so perplexing that it supports an inference of gender bias. *Purdue*, 928 F.3d at 669; *Menaker v. Hofstra University*, 935 F.3d 20 (2d Cir. 2019). When a decision is inexplicable, the merits of the decision itself may support an inference of gender bias. *Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020).

In *Doe v. Purdue University*, the United States Court of Appeals for the Seventh Circuit held that the disciplinary proceeding itself showed evidence of gender bias. 928 F.3d 652, 669 (7th Cir. 2019). In *Purdue*, the Title IX coordinator stated that she found the alleged victim credible and not the accused student despite never hearing from the alleged victim directly. *Id.* The Title IX coordinator sent her investigative report to a three-person panel of Purdue's Advisory Committee on Equity, which was tasked with making a recommendation to the Title IX coordinator after hearing from the parties. *Id.* at 657. The plaintiff was not provided with a copy of the investigative report nor made aware of its contents before his hearing, and the investigation summary failed to include favorable evidence he had submitted to the University. *Id.* Two members of his panel candidly stated that they did not read the investigative report. *Id.* The one who apparently had read the report asked the accused student accusatory questions that assumed his guilt. *Id.* The panel refused to let the accused student present witnesses, and the Title IX coordinator found him guilty of sexual violence. *Id.* Under these circumstances, the court found the deficiencies in the

proceeding raised a plausible inference that the decisionmakers chose to believe the victim because she was a woman and disbelieve the accused student because he was a man. *Id.* at 699.

Similarly, in *Doe v. Oberlin College*, the United States Court of Appeals for the Sixth Circuit held that an accused student alleged facts supporting an inference of sex bias where there were clear procedural irregularities and a record that reflected no basis for the decision. 963 F.3d at 586. In *Oberlin College*, the school conducted a 120-day investigation, even though its policy stated that investigations would usually be completed in 20 days, and the entire matter would be resolved in 60 days. *Id.* at 586-87. The policy also required the school to notify the parties of the reason for delay, which it did not do. *Id.* at 587. During the disciplinary proceeding, the panel failed to comment on a flat contradiction between what the alleged victim told the investigator and what she said during the hearing. *Id*. Further, the panel provided no apparent basis for finding that the alleged victim was incapacitated, which was the stated reason for finding the accused guilty. *Id.* at 588. The court held that the disciplinary process was so procedurally and substantively perplexing that it supported an inference of gender bias. *Id.*

Conversely, in *Doe v. Columbia College Chicago*, the United States Court of Appeals for the Seventh Circuit held there was no way to plausibly infer a disciplinary process was tainted by anti-male bias where the accused student alleged his access to documents was restricted and the disciplinary authority's decision was against the weight of the evidence. 933 F.3d 849, 856 (7th Cir. 2019). The court noted that the accused student did not allege only females accused of sexual assault could review materials. *Id.* Further, the allegation that the decision was against the weight of the evidence did not imply that the decision was based on the alleged victim's gender. *Id.* The court reasoned that the plaintiff failed to plausibly allege the disciplinary body blindly accepted the victim's allegations while finding the accused student incredible. *Id.* Under these

14

circumstances, the court found that the plaintiff failed to allege the school's investigation and adjudication were tainted by an anti-male bias. *Id.*

Here, the review process on appeal would permit a reasonable jury to find anti-male bias. Plaintiff argues that the procedure and outcome of the Student Conduct Board's appeal process was flawed.[6] [ECF No. 114 p.7]. Plaintiff argues that the University failed to follow the student conduct policy governing appeals. *Id.* The provision of the policy at issue states:

> If a student believes he or she has been wrongly accused, the appeal authority will generally limit its review of the original hearing record to the following two issues: 1) whether University disciplinary procedures were followed that provided notice of the charges and an opportunity to respond; and/or 2) whether new information exists sufficient enough to alter the original decision and why such information was not available or not presented at the original hearing. In accordance with Title IX, the accuser has the opportunity to submit an appeal in Title IX cases.

[ECF No. 115-3 (Def. 799-800)]. Plaintiff contends that this policy has its singular focus on issues relating to procedural due process and the existence of new information. [ECF No. 117 p.7]. Dr. Byington, Plaintiff contends, did not base his decision to grant an appeal on new information or a procedural flaw. *Id.* at 8. Instead, Plaintiff argues that Byington relied on a report authored after the initial hearing by the University's Title IX coordinator Denise Perez. *Id.* at 9.

Defendant points out that the plain language of the student conduct policy does not strictly limit the appeal authority's review to procedural flaws and new evidence. [ECF No. 115 p.8]. Instead, the policy "generally limits" review to those issues. *Id.* Therefore, Defendant argues,

---

[6] Plaintiff fully sets out the alleged flaws in the disciplinary process in the "Articulable Doubt" section of his response. [ECF No. 114 p.7]. However, Plaintiff also cites these flaws as evidence of anti-male bias. *Id.* at 13. The Court can, and does, consider alleged flaws in the disciplinary process as potential evidence of anti-male bias. *Doe v. Oberlin Coll.*, 963 F.3d 580, 588 (6th Cir. 2020) ([W]hether the facts of the case "cast some articulable doubt on the accuracy of the disciplinary proceeding's outcome[,]" already takes into account the proceeding's outcome to some extent. But when the degree of doubt passes from "articulable" to grave, the merits of the decision itself, as a matter of common sense, can support an inference of sex bias.") (internal citation omitted).

Byington was free to grant the appeal for other reasons. *Id.* In Defendant's view, it was perfectly permissible for Byington to request and review Perez's report in making his decision. *Id.* at 9.

Byington's deposition testimony does not reveal much about his decision to grant the appeal. When asked why he granted the appeal, Byington testified:

> I don't recall whether I made my decision specifically on new information, procedural information, as to why this decision was made to send it back for another review, but it would have been on some of these – you know, one of these criteria.

[ECF No. 114-3 (Byington Deposition p.58)][7]. When asked what new information was available that supported granting Jane Doe's appeal, Byington responded:

> I would assume it would be the blood alcohol level. Just from what I brought up earlier reading through it very quickly, it would have been related to - - it would have been related to something related to blood alcohol level, related to consent, related to any of these things that I felt it was sufficient enough for it to be heard again.

[ECF No. 114-3 (Byington Deposition p.59)]. As Plaintiff points out, Jane Doe's blood alcohol level was presented at the initial hearing. [ECF No. 114-2 (Def. 169, 242)]. When asked if he considered Perez's report in his decision to grant Jane Doe's appeal, Byington testified as follows:

> Q: And you did take into consideration the report of Ms. Perez in your decision-making; isn't that correct?
> A: It was my decision. So "take into consideration." I took the totality of the information I had in front of me.
> Q: And that included the - - the professional opinion of Ms. Perez, correct?
> A: It included all of the information I had in front of me.
> Q; And that included the professional opinion of Ms. Perez. That was - -
> A: That was - - that was in front of me, yes.
> Q: And the information – this report of Ms. Perez was not presented to the Student Conduct Board, was it?
> A: Correct. Well, at least it wasn't originally. Whether it was presented to the second board, I am not aware, so . . .
> Q; But it was not presented to the board that conducted in December - -
> A: Correct

---

[7] Page 58 of Byington's deposition was not included in the excerpts in the record due to a scrivener's error. However, the parties do not dispute that this was his testimony and that it appeared on page 58 of his deposition.

16

[ECF No. 114-3 (Byington Deposition p.62-63)].

Defendant's decision to overturn Plaintiff's acquittal appears to be unusual based on the policy language. Like the decision-making process in *Purdue* and *Oberlin College*, the school's decision-making process was somewhat perplexing. Plaintiff was found not guilty at his first hearing. Dr. Byington decided to grant Jane Doe's appeal to have the case heard again. His deposition testimony does not reveal why he decided to do so. The policy generally limits grounds for appeal to new evidence or procedural flaws. However, Dr. Byington does not say that he granted the appeal on either of these bases. As Defendant argues, the policy technically gave Dr. Byington the discretion to grant appeals on other bases. However, the justification for exercising this discretion is unclear based on the record before the court. Because there is a genuine dispute about what motivated this decision, summary judgment is inappropriate.

A reasonable jury could find anti-male bias motivated the school's decision to grant Jane Doe's appeal and order a rehearing. Against the backdrop of federal pressure to enforce Title IX, the school may have been motivated to subject acquittals of male students accused of sexual misconduct to more scrutiny. The statistical disparity in sexual misconduct actions tends to show a pattern of treating males more harshly than females in sexual misconduct actions. This backdrop, alone, is insufficient to survive summary judgment. However, in Plaintiff's particular case, his acquittal was overturned for reasons that are unclear in from the record before the Court. Although any basis for appeal was technically permitted by the policy, the appeal was unusual in that regard. Further, Dr. Byington decided to have an independent Title IX report prepared, which he reviewed in deciding to grant Jane Doe's appeal. This outside independent review of the first panel's decision is not contemplated in the school's appeal policy. This evidence may reflect an appeal

process that was unusually generous towards the female appellant. Therefore, the review process on appeal creates a genuine dispute of material fact as to gender bias.

## CONCLUSION

In sum, while most of Plaintiff's evidence is legally insufficient to create a genuine dispute of material fact, the questions surrounding the review process on appeal narrowly create a genuine dispute for trial. The Court finds that Plaintiff has put forward evidence that would allow a reasonable jury to doubt the outcome of his disciplinary proceeding and find a causal connection between the erroneous outcome and gender bias. Accordingly, Defendant's motion for summary judgment is DENIED.

IT IS SO ORDERED.

March 1, 2021
Florence, South Carolina

/s/Sherri A. Lydon
Sherri A. Lydon
United States District Judge